IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Gwendolyn Hightower, | ) | C/A No.: 1:12-2728-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

1

I.    Relevant Background

    A.    Procedural History

Prior to filing the application at issue in this case, Plaintiff was awarded DIB and supplemental security income for the period beginning on December 31, 2004, and ending on June 1, 2007, during which she underwent treatment for breast cancer, including a bilateral mastectomy and breast reconstruction.  Tr. at 96–105.  Plaintiff was denied benefits after June 1, 2007.  *Id.*

On July 29, 2008, Plaintiff filed the present application for DIB and alleged her disability began on January 1, 2008.  Tr. at 164–65.  Her application was denied initially and upon reconsideration.  Tr. at 113–14.  On January 3, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Walter C. Herin, Jr.  Tr. at 35–75 (Hr'g Tr.).  The ALJ issued an unfavorable decision on January 21, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 16–28.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 21, 2012.  [Entry #1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 40 years old at the time of the hearing.  Tr. at 40.  She completed high school in special education courses and attended technical college for approximately three months.  Tr. at 42–43, 410.  Her past relevant work ("PRW") was as a school

attendant and housekeeper.  Tr. at 68–69.  She alleges she has been unable to work since January 1, 2008.  Tr. at 164–65.

### 2.    Relevant Medical History[2]

Records show that Plaintiff was seen for a mental health assessment after having suicidal thoughts in October 2006 (approximately one and a half years prior to her alleged onset date).  Tr. at 282–89.  Doctors diagnosed her with major depressive disorder and assigned her a global assessment of functioning (GAF)[3] score of 58.  Tr. at 282.

In November 2008, John Bradley, Ph.D., evaluated Plaintiff in connection with her disability application at the request of the state agency.  Tr. at 410–13.  He noted that she was enrolled in special education courses during school and finished the 12th grade with a certificate of attendance rather than a diploma.  Tr. at 410.  Plaintiff reported to Dr. Bradley that she had struggled with depression since she was 20 years old and had been treated for depression on and off since that time, but was only receiving psychiatric medication treatment at the time of the evaluation.  *Id.*  Dr. Bradley reported that Plaintiff cried profusely when discussing the psychological effect of her cancer and double mastectomy.  Tr. at 411.  Plaintiff reported difficulty sleeping, anhedonia, poor concentration, crying spells, motor retardation, fatigue, poor self-esteem, and suicidal

---

[2] Although the record includes numerous treatment notes related to Plaintiff's alleged physical impairments, her allegations of error relate solely to her mental impairments. Therefore, the undersigned includes a summary of only those records related to Plaintiff's mental impairments.

[3] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

ideation without intent.  *Id.*  She stated she did not like to be around people, could not stand crowds, and rarely left her home.  *Id.*

On examination, Plaintiff was fully oriented and understood simple explanations and directions, but an evaluation of her cognitive processes indicated that her attention and concentration skills were below normal. Tr. at 412.  She was unable to do serial sevens forward or backward, her grammar and syntax were below normal, and her memory appeared to be below average; however, she was able to communicate using simple language, the quality of her speech was normal, the content of her conversation was appropriate to the evaluation, and her judgment and insight appeared fair.  *Id.*  Dr. Bradley opined that Plaintiff was functioning at a below normal level of intelligence, diagnosed moderate depression, and assigned a GAF score of 50.  Tr. at 412–13.  He noted that Plaintiff could meet her personal needs, communicate her thoughts and ideas, identify and avoid simple dangers, employ fair social skills despite some interpersonal avoidance, and may have difficulty managing her own finances due to her limited math skills.  *Id.*

In January 2009, state-agency psychologist Debra Price, Ph.D., reviewed Plaintiff's medical records and found that Plaintiff had severe depression and past diagnoses of anxiety and pain disorders, but did not find any evidence of mental retardation.  Tr. at 422–35.  Dr. Price opined that Plaintiff had mild restriction in her activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 432.  Dr. Price noted that Plaintiff did not receive

any ongoing mental health treatment aside from psychiatric medications.  Tr. at 434.  Dr. Price opined that Plaintiff could understand, remember, and carry out simple instructions (but would have difficulty with more complex instructions); could carry out simple tasks for two-hour periods despite some problems with concentration; could adapt to workplace changes; would not have an unacceptable number of work absences due to psychiatric symptoms; and could relate to co-workers and supervisors, but would do best with minimal contact with the general public.  Tr. at 436–38.

In May 2009, Plaintiff was hospitalized on a voluntary basis due to homicidal ideation toward her daughter.  Tr. at 617.  It was noted that she had been receiving treatment for depression for the prior two years and that her depression was primarily related to her cancer treatment.  *Id.*  Doctors assessed a GAF score of 35 on intake and diagnosed major depressive disorder and anxiety disorder.  Tr. at 621.  Three days later, doctors discharged her, recommended that she follow up with mental health treatment, and assessed a GAF score of 50.  Tr. at 617.

In June 2009, Dr. Bradley performed another evaluation of Plaintiff in connection with her disability application, this time at the request of Plaintiff's attorney.  Tr. at 686.  Dr. Bradley's observations of Plaintiff's mental status were restated almost verbatim from the November 2008 evaluation.  *Compare* Tr. at 687–88 *with* Tr. at 411–12.  Dr. Bradley reported that intelligence testing showed Plaintiff had a verbal IQ score of 61, a performance IQ score of 64, and a full scale IQ score of 59, indicating that she functioned in the mildly mentally retarded range.  Tr. at 688–89.  Dr. Bradley also found that Plaintiff scored at a fourth-grade level in reading and math.  Tr. at 690.  Dr. Bradley

diagnosed Plaintiff with major depressive disorder and mild mental retardation, and assigned her a GAF score of 50. *Id.* He opined that she could understand and follow simple directions, but that her attention span was below normal. Tr. at 686–90.

Dr. Bradley completed a psychiatric review technique form, in which he opined that Plaintiff met listings 12.04 (affective disorder) and 12.05 (mental retardation) so as to be per se disabling. Tr. at 691. Dr. Bradley found that Plaintiff had marked restriction in her ADLs; marked difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. Tr. at 701.

Dr. Bradley also completed an opinion regarding Plaintiff's ability to perform work-related activities in which he checked boxes indicating that Plaintiff had a "fair" ability in 11 areas of work-related functioning (including her ability to understand, remember, and carry out simple work instructions and make simple work-related decision) and a "poor" ability in the other 14 areas of work-related functioning (including her ability to maintain attention; sustain an ordinary routine; and understand, remember, and carry out detailed instructions), all due to her mild mental retardation and depression. Tr. at 705–08. He opined that her impairments would cause her to miss more than four days of work per month. Tr. at 708.

On July 15, 2009, Plaintiff was treated at the Aiken Center for Family Health and exhibited signs of depression. Tr. at 712. She was treated with Ultram and Effexor. Tr. at 712.

On October 12, 2009, state-agency psychologist Edward Waller, Ph.D., reviewed Plaintiff's medical records and opined that Plaintiff suffered from depression, anxiety,

and somatoform disorders related to pain.  Tr. at 721–34.  Dr. Waller further opined that Dr. Bradley's opinion that Plaintiff functioned in the mildly mentally retarded range was not supported by Plaintiff's ADLs and work history, which indicated that she functioned in at least the borderline range, if not higher.  Tr. at 733.  Dr. Waller opined that Plaintiff had moderate restriction of ADLs; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.  Tr. at 731.  Dr. Waller found that Plaintiff had the ability to understand and remember short and simple instructions; might miss an occasional work day due to depression and anxiety; and would perform better in a job setting with simple and repetitive tasks that did not require ongoing interaction with the public.  Tr. at 735–37.

> C.     The Administrative Proceedings

>> 1.     The Administrative Hearing

>>> a.     Plaintiff's Testimony

At the hearing on January 3, 2011, Plaintiff testified that she lived with her 21-year-old daughter, 12-year-old son, and 2-year-old grandson.  Tr. at 41–42.  She testified that she never obtained her driver's license because she was too anxious about the other cars.  Tr. at 44, 51.  She stated that she rode in a car three or four times per week to go to the grocery store, church, and her sister's house.  Tr. at 44–45.

Plaintiff testified that she was unable to work primarily due to her mental impairments.  Tr. at 52.  She stated that her patience and attention span were short and that she was depressed every day.  *Id.*  She reported that antidepressants helped control

her crying and suicidal thoughts. Tr. at 57. She stated that she was seen at Aiken Mental Health, but the treaters advised her to ask her primary care doctor to put her on medication. Tr. at 61. She said that she was not under the care of a psychiatrist or a therapist. Tr. at 64.

She said she had some physical problems including pain in her right knee and arthritis in her right hand. Tr. at 52, 56. She stated that she also had chronic back pain, but that pain medication helped. Tr. at 56. She reported that her medications made her sleepy, that she had monthly migraines, and that she experienced sinus pressure headaches two or three times per week. Tr. at 53, 55. She stated that she had trouble climbing steps and occasionally used a cane. Tr. at 54.

Plaintiff stated that she needed help putting on her shoes and socks, but was able to perform her own personal hygiene and occasionally prepare meals, grocery shop, do laundry, vacuum, sweep, mop, wash dishes, and rake. Tr. at 45–47. She stated that she spent approximately six or seven hours per day lying down and approximately two or three of those hours sleeping. Tr. at 55. She testified that she could stand for 30 minutes and sit for, at most, two hours at a time. Tr. at 58, 66–67. She said she was able to understand instructions better if given orally rather than in writing. Tr. at 51.

She testified that her last job was through a vocational rehabilitation program and involved assisting with handicapped children in a school setting. Tr. at 47. She stated that she performed the job "on and off" since 1988. Tr. at 48. Plaintiff said that she also previously worked part-time as a housekeeper in 2002–2004. *Id.*

### b.     Vocational Expert Testimony

Vocational Expert ("VE") L. Dixon Pearsall reviewed the record and testified at the hearing.  Tr. at 67.  The VE categorized Plaintiff's PRW as a school attendant as medium, unskilled work and as a housekeeper as light, unskilled work.  Tr. at 68–69. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with the following limitations: simple, routine, repetitive tasks; no interaction with the general public; no more than frequent stooping or balancing; no more than occasional crouching, kneeling, climbing, and crawling; and no concentrated exposure to extremes of heat and cold.  Tr. at 70.  The VE testified that the hypothetical individual could perform Plaintiff's PRW as a housekeeper as well as the jobs of sorter and table worker.  Tr. at 70–71.  The ALJ then further limited the hypothetical individual to sedentary work; no more than occasional stooping, twisting, balancing, crouching, kneeling, or climbing of stairs or ramps; no crawling or climbing of ladders, ropes, or scaffolds; simple, routine, repetitive tasks; no interaction with the general public; and no concentrated exposure to extremes of heat and cold.  Tr. at 71.  The VE responded that the hypothetical individual could perform the jobs of weigher/weight tester and surveillance monitor.  Tr. at 71–72.  The VE further testified that all work would be precluded if the individual needed to lie down for one to two hours or longer during the workday.  Tr. at 72.  The VE also stated that the limitations opined by Dr. Bradley would preclude employment.  Tr. at 72–73.

2.    The ALJ's Findings

In his decision dated January 21, 2011, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: history of bilateral breast cancer, borderline intellectual functioning, major depressive disorder, asthma, and osteoarthritis (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) in that she can lift and carry up to ten pounds occasionally and lighter objects frequently; stand and walk for no more than two hours in a workday; and sit throughout the workday.  She can occasionally stoop, twist, balance, crouch, kneel, and climb stairs or ramps, but never crawl or climb ladders or scaffolds.  She can only perform work not involving concentrated exposure to extremes of temperature.  By reason of her mental impairments, she is further restricted to simple, routine, repetitive tasks not requiring ongoing interaction with the general public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on August 19, 1970 and was 37 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).  She is now 40 years old.

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 18–28.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in concluding that Plaintiff did not meet Listing 12.05C; and

2)    the ALJ improperly discounted the opinions of Dr. Bradley.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

13

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

       B.      Analysis

          1.      Listing 12.05C

At step three of the sequential evaluation process, the Commissioner must determine whether the claimant has an impairment that meets or equals the requirements of one of the impairments listed in the regulations and is therefore presumptively disabled. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § 404.1525(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § 404.1508.

In this case, the ALJ found that Plaintiff did not meet any of the listed impairments. Tr. at 19. Relying on the intelligence testing conducted by Dr. Bradley, Plaintiff argues that the ALJ should have found that she met Listing 12.05C and was, therefore, disabled. [Entry #19 at 20–29]. Listing 12.05 provides,

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function ....

20 C.F.R. Pt. 404, Subpart P, App. 1, Listing 12.05.

The Fourth Circuit Court of Appeals has recently made clear that whether a claimant meets Listing 12.05C is a three-pronged inquiry. First, the ALJ must find that the claimant satisfies the introductory paragraph to the Listing by finding that she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before the age of 22.[6] *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012) (describing this inquiry as "Prong 1"). Next, the Listing requires a

---

[6] To the extent Plaintiff argues that this language does not create an additional affirmative requirement beyond demonstrating that an intellectual deficit existed prior to age 22 [Entry #22 at 4], the undersigned rejects the argument and refers Plaintiff to the *Hancock* decision. *Hancock* and its progeny clarify that to meet Listing 12.05, a claimant must demonstrate adaptive functioning deficits. *See Weedon v. Astrue*, No. 0:11-2971-DCN-PJG, 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases), *adopted by* 2013 WL 1315206.

claimant to satisfy one of four additional requirements, categorized in the Listing as Requirements A–D.  Here, as in *Hancock*, Requirement C is at issue, requiring an IQ score of 60–70, which the Fourth Circuit describes as Prong 2, as well as a "physical or mental impairment imposing an additional and significant work-related limitation of function," identified as Prong 3.  *Id.*

In his listing analysis, the ALJ stated as follows:

> I must comment on the claimant's level of functioning before specifically discussing the mental listings.  Testing conducted during a recent psychological examination of the claimant at the request of her attorney yielded IQ scores of verbal-61, performance-64, and full scale-59, with achievement test scores at the fourth grade level (Exhibit B-30F). . . . Other evidence of record, however, supports a determination that even those scores do not demonstrate mental retardation in the claimant.  During the hearing, her language, presence, and comprehension were all significantly better than would be expected of one with mild mental retardation.  The *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (Revised)* (DSM-IV-R) defines mental retardation as significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."  While the evidence in this case supports a finding of significant deficit in her functional academic skills, that evidence (including her work history, regular activities, living and social situation, educational history, and medical information) does not reveal significant deficits in any of the other skill areas described in the DSM-IV-R.  She completed high school and some technical college education.  She worked for a prolonged period in an educational position.  She demonstrated consistent responsibility over many years in positions where she was responsible for the well-being of classes of special needs children.  She raised a family and continues to care for her younger child and a grandchild in her home.  Thus, the claimant does not meet the basic definition of "mental retardation."  I find that the claimant does not meet or equal the requirements of Section 12.05 of the Listing of Impairments . . . .

Tr. at 19.

Plaintiff first argues that it was legal error for the ALJ to dismiss uncontradicted IQ scores. [Entries #19 at 21–23; #22 at 1–2]. In *Hancock*, however, the Fourth Circuit Court of Appeals held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. Thus, the ALJ had the authority to evaluate the IQ scores in light of the other evidence of record.

While the ALJ concluded that Plaintiff's IQ scores were not consistent with other evidence of record, he relied primarily on the lack of evidence demonstrating deficits in adaptive functioning to find that Plaintiff did not meet Listing 12.05C. Adaptive functioning deficits "can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 Fed. App'x. 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)). A finding, supported by substantial evidence, that either there are "no deficits in adaptive functioning generally" or that there was no deficiency manifested prior to age 22 would support a conclusion that Plaintiff did not satisfy this first prong of Listing 12.05. *Hancock*, 667 F.3d at 475.

While the parties dispute which out-of-circuit case is most analogous to the facts presented here, neither party cites to the Fourth Circuit's decision in *Hancock* or to the relevant cases with the District of South Carolina. In *Hancock*, the Fourth Circuit affirmed a denial of benefits where evidence showed claimant managed the household, cared for three young children, and was pursuing a GED. *Id.* at 474–76. The Fourth

Circuit believed that this evidence supported the ALJ's decision that claimant's IQ score was belied by her higher adaptive functioning, even though claimant presented educational records with poor grades. *Id.* at 476. In *Weedon v. Colvin*, the court found substantial evidence supported the ALJ's conclusion that Plaintiff did not exhibit deficits in adaptive functioning where she lived independently while serving as the main caretaker for her three children, managed her own finances, and had a significant work history, including semi-skilled work. *Weedon v. Colvin*, No. 0:11-2971-DCN, 2013 WL 1315206, at *4 (D.S.C. March 28, 2013). The district judge noted that the plaintiff's educational records, which demonstrated her enrollment in special education classes due to learning disabilities, were insufficient to overcome the substantial evidence identified by the ALJ. *Id.* In *Harts v. Astrue*, the court found that deficits in adaptive functioning did not exist where the claimant was able to live most of the time on his own, drive himself, fix small meals, dress himself, socialize with friends, and manage his own money. *Harts v. Astrue*, No. 0:10-1893-CMC-PJG, 2012 WL 529982, *6 (D.S.C. Jan. 30, 2012), *adopted by* 2012 WL 529980. Though school records demonstrating the claimant's low marks were submitted later, the court determined they did not render the ALJ's decision unsupported, as evidence showed no current deficit in adaptive functioning, "the second criterion in the introductory paragraph of 12.05." *Id.* at *7.

Here, Plaintiff also places significant weight on her educational records, which she alleges lend credence to Dr. Bradley's test results. [Entry #19 at 23–24]. In concluding that Plaintiff had failed to demonstrate sufficient deficits in adaptive functioning, the ALJ recognized Plaintiff's significant deficit in functional academic skills, but went on to cite

her work history, her responsibility on the job, and her ability to raise a family and care for her son and grandchild in her home. Tr. at 19. The ALJ also noted that there was no evidence of deficits in the skill areas of communication, self-care, home living, social/interpersonal skills, use of community resources, or self-direction. *Id.* Based on the foregoing case law and the explanation provided by the ALJ, the undersigned recommends a finding that the ALJ's conclusion that Plaintiff does not suffer from adaptive functioning deficits and, therefore, does not meet Listing 12.05C, is supported by substantial evidence.

### 2. Dr. Bradley's Opinion

Plaintiff also argues that the ALJ erred in discounting the opinion of Dr. Bradley and in failing to provide sufficient reasons for doing so. [Entry #19 at 29–33]. Plaintiff concedes that Dr. Bradley was not a treating physician, but contends that, as an examining physician, his opinions should have carried considerable weight. *Id.* at 31–33. The Commissioner responds that the ALJ's decision to discount Dr. Bradley's opinions— particularly his opinion that Plaintiff met Listing 12.05C— was supported by substantial evidence. [Entry #21 at 12–14].

Pursuant to 20 C.F.R. § 404.1527(c), an ALJ is required to evaluate medical opinions by considering the following factors: whether an examining relationship exists, whether a treatment relationship exists, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the provider is a specialist. 20 C.F.R. § 404.1527(c).

Although Dr. Bradley completed two evaluations (in November 2008 and June 2009), Plaintiff only disputes the ALJ's treatment of Dr. Bradley's June 2009 opinion.  In the opinion, Dr. Bradley reported that intelligence testing showed Plaintiff had a verbal IQ score of 61, a performance IQ score of 64, and a full scale IQ score of 59, indicating that she functioned in the mildly mentally retarded range.  Tr. at 688–89.  Dr. Bradley also found that Plaintiff scored at a fourth-grade level in reading and math.  Tr. at 690. Dr. Bradley opined that Plaintiff met listings 12.04 (affective disorder) and 12.05 (mental retardation) so as to be per se disabling.  Tr. at 691.  He also completed an opinion regarding Plaintiff's ability to perform work-related activities in which he checked boxes indicating that Plaintiff had a "fair" ability in 11 areas of work-related functioning (including her ability to understand, remember, and carry out simple work instructions and make simple work-related decision) and a "poor" ability in the other 14 areas of work-related functioning (including her ability to maintain attention, sustain an ordinary routine, and understand, remember, and carry out detailed instructions), all due to her mild mental retardation and depression.  Tr. at 705–08.  He opined that her impairments would cause her to miss more than four days of work per month.  Tr. at 708.

The ALJ accorded Dr. Bradley's opinion little weight and stated that the opinion was not supported by objective clinical findings or worthy of significant weight in evaluating Plaintiff's disability.  Tr. at 26.  The ALJ first noted that because Dr. Bradley was not a treating physician, his opinion was not entitled to any particular weight.  Tr. at 25.  The ALJ then stated that the opinions expressed by Dr. Bradley were not supported by his clinical findings in either of his evaluations or by the clinical findings of any other

medical source.  *Id.*  The ALJ noted that the findings of the mental status examination in the June 2009 report were essentially identical to those in the November 2008 report and that the GAF score was the same in both reports.  *Id.*  He referred back to his discussion in the listing analysis regarding why he did not believe that Plaintiff demonstrated mental retardation.  *Id.*  Finally, the ALJ noted Dr. Bradley's comment that Plaintiff lacked persistence with difficult items during his testing.  Tr. at 25–26.

Plaintiff argues that, although Dr. Bradley was not a treating physician, his opinion should have carried considerable weight absent the citation to substantial contradictory evidence.  [Entry #19 at 31–32].  She further contends that the ALJ failed to provide a valid reason for dismissing Dr. Bradley's opinion.  *Id.* at 32.

Despite Plaintiff's contentions, the ALJ provided specific reasons for according Dr. Bradley's opinion little weight.  The ALJ compared Dr. Bradley's two reports and found that, given the almost identical mental examination findings in the reports, the significantly more restrictive 2009 opinion was unreasonable.  The only difference between the two examinations was the additional testing Dr. Bradley performed in 2009.  However, as is discussed in detail above, the ALJ explained that he did not find the results of that testing controlling in light of the evidence demonstrating Plaintiff's long work history and ability to raise a family.  The ALJ also noted that Dr. Bradley's 2009 report indicated that Plaintiff may not have been putting forth her best effort during the testing.

Based on the foregoing, the undersigned recommends a finding that the ALJ's decision to accord Dr. Bradley's opinion little weight is supported by substantial

evidence. Although the evidence may be susceptible to more than one interpretation, the ALJ, as finder of fact, bears the ultimate responsibility of weighing the evidence and resolving evidentiary conflicts. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (noting the ALJ bears the responsibility of making findings of fact and resolving evidentiary conflicts). When, as here, the ALJ's determination is supported by substantial evidence and free of reversible legal error, the court cannot re-weigh the evidence or substitute its own judgment for that of the Commissioner. *See Hays*, 907 F.2d at 1456.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

December 11, 2013                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).